IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**LORRAINE BUTLER,**                            Case No. 5:16 CV 2998

      Plaintiff,

      v.                            Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

      Defendant.                            MEMORANDUM OPINION AND ORDER

## INTRODUCTION

Plaintiff Lorraine Butler ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 14). For the reasons stated below, the undersigned reverses the decision of the Commissioner and remands for further proceedings consistent with this decision.

## PROCEDURAL BACKGROUND

Plaintiff filed for DIB in May 2013, alleging a disability onset date of April 22, 2013. (Tr. 152-53). Her claims were denied initially and upon reconsideration. (Tr. 102, 108). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 115-16). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on September 17, 2015. (Tr. 35-65). On October 21, 2015, the ALJ found Plaintiff not disabled in a written decision. (Tr. 20-30). The Appeals Council denied Plaintiff's request for review, making

the hearing decision the final decision of the Commissioner. (Tr. 1-6); *see* 20 C.F.R. §§ 404.955, 404.981. Plaintiff timely filed the instant action on December 15, 2016. (Doc. 1).

## FACTUAL BACKGROUND

<u>Personal Background and Testimony</u>

Plaintiff was born in February 1963, making her 50 years old on her alleged onset date. *See* Tr. 152. Plaintiff was married and lived with her husband at the time of the hearing. (Tr. 41). She had one daughter who lived nearby, and a son who was in college. *Id.*

In a November 2013 function report, Plaintiff reported she was in "constant pain", and unable to hold a pen for lengthy periods, or pick up small objects. (Tr. 186). She also reported being unable to sit for long periods of time, and unable to do "much of anything". (Tr. 186-87). She "tr[ied] to go shopping for food once in awhile" and "watch[ed] TV". *Id.* Plaintiff made meals such as sandwiches and frozen dinners, and performed house work such as dusting and sweeping. (Tr. 188). She reported her "daughter has to do the bathroom [and] vacuum because it hurts me". *Id.* Plaintiff reported she went outside once per day, noting she traveled by walking, driving in a car, or riding in a car. (Tr. 189). She shopped once a week and it took about two hours. *Id.* Plaintiff shopped or went out to eat with her daughter once per week, and went to her son's football games, but "it hurt[] to sit in the stands." (Tr. 190). She also reported being "sore for days after activities". (Tr. 191). She estimated she could lift "maybe 20 pounds", and could not walk long distances. *Id.* Plaintiff reported caring for her son's dog by letting him outside and feeding him. (Tr. 187). She had to sit to dress herself due to balance problems, did not have the strength to take a bath ("can only shower"), and could not dry her hair as it "hurt[] to hold [the] blow dryer". *Id.*

At the September 3015 hearing, Plaintiff testified she had left her past job because it was hard for her to write, and she was unable to file things. (Tr. 45-46). She testified to sleep problems

and fatigue. (Tr. 46). Plaintiff thought she could not work because of her fatigue and inability to concentrate. (Tr. 47-48).

Plaintiff reported seeing primary care physician Dr. Peiffer and pain management physician Dr. Vucetic. (Tr. 49-50). Plaintiff had been in pain management for four or five months and that it was helpful to have a physician who is "more aware of fibromyalgia" than her primary care physician. (Tr. 50). She reported the pain was constant and she was taking Flexeril. (Tr. 48). She only took the Flexeril "when it's bad, real bad" because it made her disoriented. (Tr. 49). She had tried water physical therapy, which "felt okay while [she] was in it" but it caused increased pain after. *Id.*

Plaintiff stated that on a typical day she sleeps late in the morning "because of not being able to sleep at night". (Tr. 55-56). She fed the dog, and made sandwiches or meals in the microwave. (Tr. 56). She also watched television and checked Facebook on her phone. *Id.* Plaintiff put dishes in the dishwasher, and dusted; her husband did "a lot of the laundry". (Tr. 57). Plaintiff went grocery shopping, but "[n]ot a lot", would typically go with her husband, and she had to hold on to the shopping cart. *Id.* Plaintiff testified that her fatigue and pain would flare up from attempting to cook a meal, and she would have to take breaks while doing so. (Tr. 58-59).

Plaintiff estimated she could walk "a couple blocks maybe" and could stand for "only about 20 minutes at the most". (Tr. 51). She stated she could not bend over or squat down "without feeling lightheaded or not being able to get back up if [she was] squatting". *Id.* She estimated she could sit for about twenty minutes at a time before having to stand due to back pain. (Tr. 52). Plaintiff testified she had difficulty with the grip in her hands due to fibromyalgia. (Tr. 52-53).

<u>Relevant Medical Evidence</u>[1]

At a May 2012 appointment with Rebecca Andaloro, M.D., at Montrose Primary Care, Plaintiff reported neck stiffness and pain, weakness, paresthesia, and intermittent bilateral upper extremity pain. (Tr. 329-30). On examination, Dr. Andaloro noted bilateral trapezius spasm, and decreased neck range of motion, but normal gait, muscle strength, and muscle tone. (Tr. 331).

In December 2012, Plaintiff returned to Dr. Andaloro complaining of arm, hand, and leg pain for the past three years, as well as lightheadedness and a feeling that she could not get up after laying down. (Tr. 281). Plaintiff reported a progressive worsening of pain and fatigue. *Id.* On examination, Dr. Andaloro noted abnormal gait and balance, as well as tenderness in Plaintiff's neck, elbow joint, and bilateral lateral proximal extension tendon. (Tr. 285). Her neck range of motion was also abnormal. *Id.*

In April 2013, Plaintiff returned to Dr. Andaloro reporting pain, stiffness, and paresthesia in her knees ad wrists, as well as headaches and nausea. (Tr. 304-05). She reported difficulty at work, missing work, and worsening pain "after working in the yard". *Id.* On examination, Dr. Andaloro noted normal gait and ability to climb on exam table, but neck tenderness, stiffness, and abnormal range of neck motion. (Tr. 309). Dr. Andaloro assessed, inter alia, "[m]alaise and fatigue (not chronic fatigue syndrome)". *Id.* Dr. Andaloro referred Plaintiff to a neurologist. (Tr. 310).

In May 2013, Plaintiff saw neurologist DeRen Huang, M.D., at NNA Neuroscience Center. (Tr. 251-55). Plaintiff reported right-sided pain, tingling, and numbness, accompanied by weakness, blurred vision, and neck stiffness. (Tr. 251). Plaintiff reported yard and house work

---

1. Plaintiff challenges only the ALJ's decision regarding her physical impairments, specifically as they relate to her fibromyalgia. *See* Doc. 15, at 13-25. She does not challenge the ALJ's determination regarding her mental impairments. *See* Doc. 18, at 5. As such, the undersigned summarizes only the relevant records here. *See Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003).

weekly. (Tr. 252). On examination, Dr. Huang noted Plaintiff was "hypersensitive to pin prick on the right side" and had "decreased sensation to light touch and vibration on the right side." (Tr. 254). She also had normal sitting and standing, and normal muscle testing. (Tr. 253). Dr. Huang stated Plaintiff's symptoms were "suggestive for multiple sclerosis" and noted other differential diagnoses. (Tr. 254).

Plaintiff returned to Dr. Huang in June 2013 after "[u]nremarkable" MRIs of her head and spine, and a negative NCS/EMG study. (Tr. 246); *see also* Tr. 273 (cervical spine MRI). Dr. Huang noted Plaintiff had "multiple pressure points throughout her whole body (>15) that when pressed she jumps, gets teary eyed and states that hurts." (Tr. 246). Dr. Huang wrote a letter to Dr. Andaloro noting Plaintiff had "muscle pain, paresthesias in her upper arms especially but all over the body." (Tr. 249). He again noted the "15 pressure points" and stated Plaintiff had "indications of fibromyalgia". *Id.* He started Plaintiff on Lyrica, and instructed her to continue vitamin D and B12 supplementation. *Id.*

In November 2013, Plaintiff followed up with Dr. Andaloro. (Tr. 275-80). Plaintiff reported her fibromyalgia diagnosis, and prescription for Neurontin. (Tr. 275). She reported it helped her pain, but "made [her] feel like she was gonna [sic] fall over when she stood up so [she] stopped the medication." *Id.* Plaintiff continued to report significant pain, stating that she could not even close her hands. *Id.* Plaintiff also reported "[s]he did not tolerate lyrica" as it made her tired; she had taken it for one month. *Id.* She had pain in her knees "when she increased walking at the track". *Id.* Dr. Andaloro noted Dr. Huang's diagnosis of fibromyalgia, also noting, "Dr. Sheers thought she had fibromyalgia / Dr. Harrington did not feel she had fibromyalgia." *Id.* Plaintiff had "not worked since spring." *Id.* Plaintiff reported neck and back stiffness, as well as joint pain and swelling, limitation of joint movement, and muscle pain. (Tr. 277). She also reported

weakness, numbness, and difficulty sleeping. (Tr. 278). Dr. Andaloro assessed fibromyalgia, and noted she would "trial Cymbalta" for Plaintiff's fibromyalgia. (Tr. 278-79).

At a consultative psychological examination in December 2013, Plaintiff reported pain and shaking in her hands, and that she was "very fatigued and ha[d] insomnia". (Tr. 339). Plaintiff reported being capable of taking care of personal hygiene, and that she was "mostly capable with independent activities of daily living." (Tr. 340). She reported typical activities of "doing housework, spending time with her children, and taking care of her son's dog". *Id.* She also described her energy level as "poor" and noted it to be "generally inadequate for most routine daily tasks" due to fatigue and loss of stamina. *Id.* Her gait and posture were noted to be normal. *Id.*

In April 2014, Plaintiff saw Kelli Peiffer, D.O., at Montrose Primary Care. (Tr. 350-54). Plaintiff reported she had "tried neurontin and lyrica but made her feel like going to fall over", and had also tried Cymbalta but "had some GI issues" and was "only on for 3 weeks then stopped". (Tr. 350). Plaintiff had not been on any medications, but had "been in a lot of pain lately" and could not "do much anymore because of extreme fatigue" and that "if she does do anything it takes 2 d[ays] to get over the fatigue". *Id.* Dr. Peiffer assessed fibromyalgia and prescribed Cymbalta as Plaintiff stated she wanted to try it again. (Tr. 353).

Plaintiff returned to Dr. Peiffer in December 2014 to follow-up on her fibromyalgia. (Tr. 378-82). Plaintiff continued to report "a lot of pain", including "groin pain to the poi[nt] where she can't walk upstairs", "can't get out of bed", and "can barely sleep because of the pain." (Tr. 378). She also had pain in her sacroiliac joint. *Id.* Again, Plaintiff reported "if she tries to do anything she is layed [sic] up with pain for 3 days". *Id.* On examination, Dr. Peiffer noted hip joint tenderness and abnormal range of motion, as well as "severe pain with log rolling of right hip and also pain with hip flexion and external rotation". (Tr. 380). Dr. Peiffer assessed hip pain, and

suspected osteoarthritis in the hip joint; she ordered x-rays. (Tr. 381). She also referred Plaintiff to pain management for her fibromyalgia pain. *Id.* The x-rays showed mild osteoarthritis in Plaintiff's right hip. (Tr. 396).

In April 2015, Plaintiff went to the emergency room for a cough. (Tr. 384). Her upper and lower extremity examinations were normal. (Tr. 385).

In May 2015, Plaintiff saw Henry E. Vucetic, M.D., at the Spine & Pain Institute. (Tr. 370-71, 418-22). Plaintiff reported "all over body pain" that was "moderate." (Tr. 370). The pain was aggravated by numerous activities ("includ[ing] grooming, dressing, writing, standing, sitting, walking, pu[s]hing, pulling, climbing, riding, activities, sports, [and] hobbies."). *Id.* The pain was relieved by laying down. *Id.* Plaintiff reported she "ha[d] been tried on Lyrica and Cymbalta and she could not tolerate the side effects." *Id.* On examination, Dr. Vucetic noted reduced range of motion in Plaintiff's lumbar spine, as well as painful hip range of motion. (Tr. 421). He also noted Plaintiff had "16 of 18 Fibromyalgia [t]ender points." *Id.* Dr. Vucetic prescribed six weeks of warm water therapy, noting that "[s]tudies show that regular activity is the most beneficial treatment for fibromyalgia". (Tr. 371, 422). He also noted he discussed "trying topamax or savella in the future" and that he would order a topical pain cream at the next visit. *Id.*

Plaintiff returned to Dr. Vucetic in June 2015, continuing to report aching all over body pain with a moderate severity level. (Tr. 412). Plaintiff reported she had done three weeks of physical therapy, and reported "that the activity in the pool has felt good but she has increases in pain that day and next morning". *Id.* Plaintiff also reported a fall in which she fell on her right ribs. *Id.* On examination, Dr. Vucetic noted chest wall tenderness, painful sacroiliac joint, lumbar tenderness, and buttock pain. (Tr. 415). He again noted painful lumbar spine range of motion, painful hip range of motion, and sixteen out of eighteen fibromyalgia tender points. *Id.* Dr. Vucetic

assessed "[a]ching muscles", and instructed her to continue water therapy and follow up in two to four weeks. (Tr. 416). He also ordered a shoulder x-ray, and administered an injection. *Id.* He prescribed Flexeril for myofascial pain, a Flector pain patch, and a Medrol Dose pack to decrease body inflammation in the right shoulder and ribs. *Id.* August 2015 x-rays of Plaintiff's right shoulder showed minimal osteoarthritic changes of the right acromioclavicular joint. (Tr. 410).

*Opinion Evidence*

In January 2014, state agency physician Lynne Torello, M.D., reviewed Plaintiff's records. (Tr. 84-86). She opined Plaintiff could: perform light work with no climbing of ladders, ropes, and scaffolds, but could occasionally balance, and frequently climb ramps and stairs, stoop, kneel, crouch, and crawl. (Tr. 84). She also limited Plaintiff to handling and fingering with her right hand, and that she should avoid concentrated exposure to hazards such as machinery or heights. (Tr. 85). In March 2014, state agency physician Elizabeth Das, M.D., reviewed Plaintiff's records, and affirmed Dr. Torello's conclusions. (Tr. 94-96).

In September 2015, Dr. Vucetic completed a form regarding Plaintiff's ability to complete work-related activities. (Tr. 423-24). He opined Plaintiff could lift or carry ten pounds occasionally ("from very little up to 1/3 of an 8-hour day") because of myofascial pain. (Tr. 423). He opined Plaintiff could stand or walk for one to two hours during an eight-hour workday (fifteen to twenty minutes without interruption); and sit for two hours (fifteen to twenty minutes without interruption). *Id.* He opined Plaintiff could occasionally stoop or crouch, but could never climb, balance, kneel, or crawl. (Tr. 423). He cited Plaintiff's fibromyalgia with tender points as the reasons for these restrictions. *Id.* He opined Plaintiff would be absent from work more than four days per month, and would be off-task over 20 percent of an eight-hour workday due to pain or fatigue. *Id.* He also opined Plaintiff would need to lie down for thirty minutes during the course of

an eight-hour workday, and would only be able to use her hands or fingers for seventy percent of a day. (Tr. 424). He noted Plaintiff's "fibromyalgia [was] more advanced than most as she ha[d] the chronic fatigue component". *Id.* He stated that "[a]fter short periods of work/activity . . . [she] will require rest/sleep", and that this would affect Plaintiff's ability to "do jobs that require concentration difficult." *Id.*

VE Testimony

A VE appeared and testified at the hearing before the ALJ. (Tr. 59-63). The ALJ first asked the VE to consider a hypothetical individual of Plaintiff's age, education, and past work experience who was physically:

> limited to light work, which is specifically lifting and carrying occasionally 20 pounds and frequently 10 pounds; with sitting, standing, and walking up to six hours of a workday; and push and pull as much as she can lift and carry; with the additional limitations of frequent handling bilaterally and frequent fingering bilaterally; with frequent climbing ramps and stairs, never climbing ladders or scaffolds; occasional balancing; frequent stooping, kneeling, crouching, and crawling; never at unprotected heights, and never any moving mechanical parts[.]

(Tr. 61).[2] The VE testified such an individual could not perform past work, but could perform other jobs. (Tr. 61-62).

The ALJ then asked the VE to assume the same hypothetical individual, but changed the exertional level from light to sedentary. (Tr. 62). The VE testified such an individual could not perform past work. *Id.*

Plaintiff's counsel then asked if any of the jobs identified would be available to an individual who is off task twenty percent of the time, or who missed four days of work per month. (Tr. 63). The VE testified that no jobs would be available to such an individual. *Id.*

---

2. The hypothetical question also included mental limitations. *See* Tr. 61.

ALJ Decision

In her written decision, the ALJ found Plaintiff met the insured status requirements through December 31, 2017, and had not engaged in substantial gainful activity since her alleged onset date. (Tr. 22). She found Plaintiff had severe impairments of fibromyalgia, depression, obesity and osteoarthritis, but none of these impairments—singly or in combination—met or medically equaled the severity of one of the listed impairments. *Id.* The ALJ then concluded Plaintiff had the physical residual functional capacity to:

> perform light work as defined in 20 CFR 404.1567(b) except [she] can lift and carry twenty pounds occasionally and ten pounds frequently. She can sit, stand and walk for six hours each in an eight-hour workday. She can push and pull as much as she can lift and carry. She can frequently handle and finger with both upper extremities. She can frequently climb ramps and stairs but never climb ladders and scaffolds. She can occasionally balance and frequently stoop, kneel, crouch and crawl. She can never work around unprotected heights or moving mechanic[al] parts.

(Tr. 24).[3] The ALJ then found Plaintiff could not perform any past relevant work. (Tr. 28). Based on the testimony from the VE, however, the ALJ found Plaintiff could perform other jobs that exist in significant numbers in the national economy. (Tr. 29). Therefore, the ALJ concluded Plaintiff was not disabled. (Tr. 30).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health &*

---

3. The RFC also included mental limitations, which are not at issue here. *See* Tr. 24-25.

*Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to

establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

**DISCUSSION**

Plaintiff argues the ALJ: 1) violated Social Security Rulings ("SSR"s) 96-2p and 12-2p in evaluating Dr. Vucetic's opinion; and 2) violated SSR 96-7p in evaluating Plaintiff's subjective symptom statements. The Commissioner responds that the ALJ's decision is supported by substantial evidence, and should be affirmed.

<u>Fibromyalgia & Dr. Vucetic's Opinion</u>

Plaintiff contends the ALJ erred in her treatment of Dr. Vucetic's opinion—both by violating the treating physician rule, and by providing inappropriate reasons for the weight given that opinion. The Commissioner responds that the ALJ properly evaluated Dr. Vucetic's opinion and her reasons were supported by substantial evidence.

Generally, medical opinions of treating physicians are accorded greater deference than non-treating physicians. *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96–2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers,* 486 F.3d at 242.

A treating physician's opinion is given "controlling weight" if it is supported by: 1) medically acceptable clinical and laboratory diagnostic techniques; and 2) is not inconsistent with other substantial evidence in the case record. *Id.* (citing *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544 (6th Cir. 2004)). When a treating physician's opinion does not meet these criteria, an ALJ must weigh medical opinions in the record based on certain factors. 20 C.F.R. § 404.1527(c)(2). In determining how much weight to afford a particular opinion, an ALJ must consider: (1) examining relationship; (2) treatment relationship—length, frequency, nature and extent; (3) supportability—the extent to which a physician supports his findings with medical signs and laboratory findings; (4) consistency of the opinion with the record as a whole; and (5) specialization. *Id.; Ealy v. Comm'r of Soc. Sec.,* 594 F.3d 504, 514 (6th Cir. 2010).

Importantly, the ALJ must give "good reasons" for the weight he gives a treating physician's opinion, reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.*

The regulations also provide that "[r]egardless of its source, we will evaluate every medical opinion we receive." 20 C.F.R. § 404.1527(c). As to non-treating medical sources, the regulations require ALJs to weigh their opinions "based on the examining relationship, (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)). Although the ALJ need not provided "good reasons" for the weight assigned to non-treating source opinion, the findings made must still be supported by substantial evidence.

*Fibromyalgia*

Fibromyalgia "is a medical condition marked by 'chronic diffuse widespread aching and stiffness of muscles and soft tissues.'" *Rogers*, 486 F.3d at 244 n.3 (quoting Stedman's Medical Dictionary for Health Professionals and Nursing, 542 (5th ed. 2005)); *see also* SSR 12-2p, 2012 WL 3104869, at *2 (fibromyalgia is a "complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months"). Diagnosing fibromyalgia involves "observation of the characteristic tenderness in certain focal points, recognition of hallmark symptoms, and 'systematic' elimination of other diagnoses." *Rogers*, 486 F.3d at 244 (quoting *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 820 (6th Cir. 1988)). "[P]hysical examinations will usually yield normal results—a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions. There are no objective tests which can conclusively confirm the disease; rather it is a process of diagnosis by exclusion." *Preston*, 854 F.3d at 818.

This makes the credibility determination particularly relevant where a claimant has been diagnosed with fibromyalgia. "Opinions that focus solely upon objective evidence are not particularly relevant" due to "the unique evidentiary difficulties associated with the diagnosis and treatment of fibromyalgia." *Rogers*, 486 F.3d at 245. Cases involving fibromyalgia "place[] a premium . . . on the assessment of the claimant's credibility." *Swain v. Comm'r of Soc. Sec.*, 297 F. Supp. 2d 986, 990 (N.D. Ohio 2003). This is so because "unlike medical conditions that can be confirmed by objective testing, fibromyalgia patients present no objectively alarming signs." *Rogers*, 486 F.3d at 243. "Nonetheless, a diagnosis of fibromyalgia does not automatically entitle [a claimant] to disability benefits." *Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 806 (6th Cir.

2008). "Some people may have a severe case of fibromyalgia as to be totally disabled form working but most do not, and the question is whether claimant is one of the minority." *Id.* at 806.

"The Sixth Circuit has issued strong opinions on this point, in one case reversing a district court's decision to affirm the ALJ's denial because of the ALJ's undue emphasis on the lack of objective evidence." *Cooper v. Comm'r of Soc. Sec.*, 2014 WL 4606010, at *16 (E.D. Mich.) (citing *Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 861 (6th Cir. 2011)) ("[T]he ALJ's rejection of the treating physicians' opinions as unsupported by objective evidence in the record obviously stems from his fundamental misunderstanding of the nature of fibromyalgia.").

Social Security Ruling 12-2, Evaluation of Fibromyalgia, "provides guidance on how we develop evidence to establish that a person has a medically determinable impairment of fibromyalgia, and how we evaluate fibromyalgia in disability claims . . . ." SSR 12-2p, 2012 WL 3104869, at *1. The Ruling also states that fibromyalgia should be analyzed under the traditional five-step evaluation process used for analyzing other claims for disability. *Id.* at *5-6.

Preliminarily, the parties dispute whether Dr. Vucetic qualifies as a "treating physician" subject to the deference required by the regulations. The Commissioner contends that Dr. Vucetic only saw Plaintiff twice before authoring his opinion, and this is insufficient to establish a treating relationship. Moreover, the Commissioner contends consideration of the factors in 20 C.F.R. § 404.1527 supports the ALJ's decision to give Dr. Vucetic's opinion little weight. Plaintiff responds that even if Dr. Vucetic is not considered a treating source, the ALJ did not provide proper reasons for discounting his opinion. The undersigned tends to agree with the Commissioner that two visits in two months does not establish a treating relationship. *See, e.g.*, *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 506-07 (6th Cir. 2006) ("[A] plethora of decisions unanimously hold that a single visit does not constitute an ongoing treatment relationship . . . . Indeed, depending on the

circumstances and the nature of the alleged condition, two or three visits often will not suffice for an ongoing treatment relationship."); *see also Helm v. Comm'r of Soc. Sec.*, 405 F. App'x 997, 1000 n.3 (6th Cir. 2011) ("[I]t is questionable whether a physician who examines a patient only three times over a four-month period is at treating source—as opposed to a nontreating (but examining) source."). However, it is not necessary to resolve this issue here because even if Dr. Vucetic is not a treating physician, the undersigned finds the ALJ erred in her analysis of his opinion.

Here, the ALJ summarized Dr. Vucetic's opinion, and explained she gave the opinion "little weight because it appears to be based largely on the claimant's subjective complaints" and "[i]ndeed, the objective findings do not indicate limitations to the degree found in his opinion." (Tr. 28). The ALJ's reasons given for discounting Dr. Vucetic's opinion are precisely the sort of reasons the Sixth Circuit has found improper for discounting an opinion based on fibromyalgia limitations. *See, e.g., Kalmbach*, 409 F. App'x at 861. That is, rejecting an opinion based on fibromyalgia because it was "based largely on the claimant's subjective complaints" and "[i]ndeed, the objective findings do not indicate limitations to the degree found in his opinion" (Tr. 28), "stems from [a] fundamental misunderstanding of the nature of fibromyalgia". *Kalmbach*, 409 F. App'x at 861. And, even if Dr. Vucetic is not a treating physician, the ALJ's reasons for the weight given to medical opinion evidence must still be supported by substantial evidence. Discounting a physician's opinion for reasons not relevant to the impairment upon which that opinion is based cannot be substantial evidence. As such, remand is required.[4]

---

4. The Commissioner also offers several additional reasons for discounting Dr. Vucetic's opinion: 1) it is inconsistent with the record as a whole; 2) it "conflicted with Plaintiff's failure to comply with the doctor's own recommendation, despite her complaints of pain after three weeks, to complete six weeks of warm water therapy, which he indicated would have been very beneficial"; 3) it conflicted with Plaintiff's "ability to perform a range of daily activities inconsistent with total

Credibility

Plaintiff secondly alleges the ALJ violated SSR 96-7p in evaluating her credibility. The Commissioner responds that the ALJ properly evaluated Plaintiff's subjective complaints and her decision should be affirmed.

As noted above, subjective complaints are particularly relevant in cases alleging disability based on fibromyalgia. *See Rogers*, 486 F.3d at 248 ("[G]iven the nature of fibromyalgia, where subjective pain complaints play an important role in the diagnosis and treatment of the condition, providing justification for discounting a claimant's statements is particularly important."). The Sixth Circuit has long recognized, "pain alone, if the result of a medical impairment, may be severe enough to constitute disability." *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984); *see also Grecol v. Halter*, 46 F. App'x 773, 775 (6th Cir. 2002). As the relevant Social Security regulations make clear, however, a claimant's "statements about [his] pain or other symptoms will not alone establish that [he is] disabled." 20 C.F.R. § 404.1529(a); *see also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997); *Hash v. Comm'r of Soc. Sec.*, 309 F. App'x 981, 989 (6th Cir. 2009).

A claimant's assertions of disabling pain and limitation are evaluated under the following standard:

---

disability". (Doc. 17, at 18). But these are not the reasons advanced by the ALJ for discounting Dr. Vucetic's opinion, and are, rather, a post-hoc justification for the ALJ's conclusion. Adopting such an analysis would be improper post-hoc rationalization. *See Williams v. Comm'r of Soc. Sec.*, 227 F. App'x 463, 464 (6th Cir. 2007) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)) (a reviewing court, in assessing the decision of an administrative agency, must judge its propriety solely by the grounds invoked by the agency). Here, the ALJ only stated she gave the opinion little weight for two reasons: because it "appear[ed] to be based largely on the claimant's subjective complaints" and because "the objective findings do not indicate limitations to the degree found in [the] opinion". (Tr. 28). The Commissioner's post-hoc rationalization cannot save this improper analysis.

First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

*Walters*, 127 F.3d at 531 (citations omitted). In determining whether a claimant has disabling pain, the regulations require an ALJ to consider certain factors including: 1) daily activities; 2) location, duration, frequency, and intensity of pain or symptoms; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of any medication; 5) treatment, other than medication, to relieve pain; 6) any measures used to relieve pain; and 7) other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c); SSR 96-7p, 1996 WL 374186, at *3 ("20 CFR 404.1529(c) . . . describe[s] the kinds of evidence, including the factors below, that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements").[5] Although the ALJ must "consider" the listed factors, there is no requirement that the ALJ discuss every factor. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 287 (6th Cir. 2009); *Roberts v. Astrue*, 2010 WL 2342492, at *11 (N.D. Ohio).

In this respect, it is recognized that the ALJ's credibility assessment "must be accorded great weight and deference." *Workman*, 105 F. App'x at 801 (citing *Walters*, 127 F.3d at 531); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 536 (6th Cir. 2001) (quoting *Myers v.*

---

5. Subsequent to the date of the ALJ's decision, the Social Security Administration issued new Social Security Ruling 16-3p, which supersedes Social Security Ruling 96-7p. The Sixth Circuit characterized SSR 16-3p as merely eliminating "the use of the word 'credibility' . . . to 'clarify that the subjective symptoms evaluation is not an examination of an individual's character.'" *Dooley v. Comm'r of Soc. Ec.*, 656 F. App'x 113, 119 n.1 (6th Cir. 2016). The Social Security Administration has stated SSR 16-3p is not to be applied retroactively. 82 Fed. Reg. 49462, 49468 n.27 (Oct. 25, 2017), available at https://www.gpo.gov/fdsys/pkg/FR-2017-10-25/pdf/2017-23143.pdf.

*Richardson*, 471 F.2d 1265, 1267 (6th Cir. 1972) ("[i]t [i]s for the [Commissioner] and his examiner, as the fact-finders, to pass upon the credibility of the witnesses and weigh and evaluate their testimony")). An ALJ's finding that a claimant's subjective allegations are not fully supported is a finding that should not be lightly disregarded. *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 780 (6th Cir. 1987). Nevertheless, an ALJ's decision to discount a claimant's credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186, at *2.

The ALJ here recited the two-step credibility process:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

(Tr. 25). Later in her decision, the ALJ then explained Plaintiff's "allegations are not fully supported by the medical evidence of record." (Tr. 28). She described Plaintiff's fibromyalgia as her "most limiting impairment" but concluded:

> the degree of limitation and pain alleged during treatment and the appeals process is not corroborated by the record. Indeed, the claimant was largely noncompliant with medication. While she indicated side-effects from each medication, she also discontinued use shortly after the medications were prescribed. Further, the record indicates only a few episodes of physical therapy despite treating sources noting it as an effective treatment for fibromyalgia. Overall, the degree of limitation and fatigue is not corroborated in the treatment notes findings.

*Id.*

First, although the ALJ states that "the degree of limitation and pain alleged" is not supported by the record, and that "[o]verall the degree of limitation and fatigue is not corroborated

in the treatment notes findings", the ALJ cites to no specific evidence to support this conclusion. *See id.* This is not a "specific reason[] for the finding on credibility, supported by the evidence in the case record . . . sufficiently specific to make clear to the individual and any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186, at *2.

Second, SSR 96-7p provides that a claimant's statements "may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure". 1996 WL 374186, at *7. The regulations, however, also instruct that the ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide." *Id.* The regulations then provide examples, noting that "[t]he explanations provided by the individual may provide insight into the individual's credibility", providing as one example: "[t]he individual may not take prescription medication because the side effects are less tolerable than the symptoms." *Id.* at *8.

The ALJ is correct that Plaintiff tried and stopped several medications. *See* Tr. 275 ("She did not tolerate lyrica – she was tired – she took it for one month" and "pt was put on Neurontin, helped pain but made patient fe[e]l like she was going to fall over when she stood up so patient stopped the medication"); Tr. 350 ("tried neurontin and lyrica but made her feel like going to fall over" and "tried Cymbalta back in the winter, had some GI issues – only on for 3 weeks then stopped"); Tr. 370 ("ha[d] been tried on Lyrica and Cymbalta and she could not tolerate the side effects."); Tr. 378 ("she restarted the Cymbalta and she had to stop because it gave her tremors-stopped taking it after 3 weeks-also made her dizzy and affecting her mood.") However, despite

acknowledging that Plaintiff experienced side effects from each medication, the ALJ found this detracted from Plaintiff's credibility because "[w]hile she indicated side-effects from each medication, she also discontinued use shortly after the medications were prescribed." (Tr. 28). Notably, however, although Plaintiff's treating physicians noted cessation of various medications, none of them instructed Plaintiff to continue those medications despite her side effects. *See* Tr. 275, 350, 370. In fact, these physicians continued to try different medications and treatments to address Plaintiff's pain. *See* Tr. 275-79 (noting Plaintiff's intolerance for Lyrica and planning to try Cymbalta); Tr. 350-53 (noting Plaintiff had previously tried Neurontin, Lyrica, and Cymbalta, and refilling Cymbalta as "she would like to give Cymbalta another chance"); Tr. 378-81 (noting Plaintiff had re-started Cymbalta but had to stop because of side effects, and referring Plaintiff to pain management); Tr. 370 (noting Plaintiff's intolerance for Lyrica and Cymbalta, ordering physical therapy, and noting "trying topamax or savella in the future" as well as noting "[s]he may do well with a topical pain cream as well"); Tr. 416-17 (prescribing, inter alia, a pain patch to be applied "2 times every day to most painful area"); Tr. 422 (prescribing warm water therapy and noting that "regular activity is the most beneficial treatment for fibromyalgia"). Thus, the undersigned finds the ALJ's interpretation of these records as showing Plaintiff was "largely noncompliant with treatment" is not supported by the record. *See* SSR 96-7p, 1996 WL 374186, at *7 ("Persistent attempts by the individual to obtain relief of pain or other symptoms . . . may be a strong indication that the symptoms are a source of distress to the individual and generally lend support to an individual's allegations of intense and persistent symptoms").

Third, however, the ALJ's statement that "the record indicates only a few episodes of physical therapy despite treating sources noting it as an effective treatment for fibromyalgia" (Tr. 28), finds some support in the record. Again, Plaintiff reported side effects from the water therapy.

*See* Tr. 412 ("She has started her PT over the last 3 weeks. She reports that the activity in the pool has felt good but she has increases in pain that day and next morning."). Despite Plaintiff's complaints, Dr. Vucetic, the prescribing physician, advised Plaintiff to "[co]ntinue water therapy" and follow up in two to four weeks. (Tr. 416). Therefore, as with the medication side effects, Plaintiff reported a side effect from this treatment (which, as Plaintiff points out, the ALJ failed to acknowledge). *See* Tr. 412 (reporting increased pain after physical therapy); Tr. 26 (ALJ decision noting Plaintiff "reported some positive results from water therapy on June 10, 2015"). In contrast to the medication side effects, however, with regard to the physical therapy, Dr. Vucetic specifically advised Plaintiff to continue the treatment despite those side effects. *See* Tr. 416. And, Plaintiff testified she stopped going after three weeks due to pain. (Tr. 49) ("I tried it for about three weeks"; "I was just in too much pain to go back"). Thus, the undersigned finds this reason supported by the record.[6]

An ALJ's credibility analysis is especially important in cases of fibromyalgia due to the nature of the disease. *See Rogers*, 486 F.3d at 248 ("[G]iven the nature of fibromyalgia, where subjective pain complaints play an important role in the diagnosis and treatment of the condition, providing justification for discounting a claimant's statements is particularly important."). Taken as a whole, the undersigned finds too many errors in the ALJ's credibility analysis—and the one reason supported by the evidence insufficient to support the decision. And, because as discussed

---

6. The Commissioner also points to Plaintiff's daily activities as supporting the ALJ's credibility decision. *See* Doc. 17, at 14 (citing Tr. 23). The analysis the Commissioner points to, however, is not part of the ALJ's credibility analysis, but rather part of the ALJ's analysis of whether Plaintiff's mental impairments met or equaled a listing. *See* Tr. 23. Thus, while daily activities are a proper consideration in evaluating subjective symptom reports, *see* SSR 96-7p, 1996 WL 374186, at *7-8, the ALJ did not do so here, and the Commissioner's attempt to use this to justify the ALJ's decision is a post-hoc rationalization that this Court cannot rely upon. *See Williams*, 227 F. App'x at 464.

above remand is already required due to an error in assessing medical opinion, the undersigned instructs the Commissioner on remand to also re-evaluate Plaintiff's credibility.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB not supported by substantial evidence and reverses and remands that decision under Sentence Four of 42 U.S.C. § 405(g) for proceedings consistent with this opinion.

 s/James R. Knepp II
United States Magistrate Judge